**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 24-263** |
| **DONALD MICHAEL** <br> **a/k/a "Baseball Fun"** | : | |

# GOVERNMENT'S SENTENCING MEMORANDUM

Over a period of 18 months between 2020 and 2021, the defendant and his co-conspirators, Andrew Wolf and Kray Strange, operated an elaborate online child exploitation catfishing scheme to entice minor boys to self-produce sexually explicit images and send them to the defendants over the Internet. At the time, the defendant had been a youth baseball coach for nearly 20 years in Northern Virginia, and regularly bragged to his co-conspirators about his access to minor boys. Wolf was in his eighteenth year as a middle school teacher at Springside Chestnut Hill Academy ("SCH") in Philadelphia, Philadelphia, and Strange was a young adult living in Carthage, New York. Together, the three targeted boys with large social media followings, such as Little League World Series players and child Tik Tok stars, as well as dozens of Wolf's own boy middle school students. Throughout their months of communications (which amount to more than 300 pages), on a near daily basis, the defendant and his co-conspirators also discussed their shared sexual interest in children and traded images and videos of child sexual abuse material ("CSAM"), or child pornography.

The government and the defendant entered into a guilty plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), in which the parties agreed to jointly recommend within a range of 265 to 340 months' imprisonment, to be followed by a period of at least 15 years of supervised release, and a $500 special assessment. As further discussed herein,

the parties also have reached an agreement as to restitution due to three minor victims who have made restitution claims. Consistent with the parties' agreement, the government requests the Court order the defendant to pay a total of $137,833 in restitution.

A sentence in the range of 265 to 340 months' imprisonment falls within or slightly below the bottom of the defendant's sentencing guideline range, which is 292 to 365 months' imprisonment. As further discussed herein, this plea agreement reflects the government's consideration of the defendant's relative culpability when compared with his co-conspirators, in addition to the nature and circumstances of the offense, the defendant's history and characteristics, and the other sentencing factors set forth in 18 U.S.C. § 3553(a). Most importantly, the acceptance of the plea agreement spares at least 10 teenage boys, some of whom are now young adults, (and possibly more), from having to testify about the terribly embarrassing and difficult subject of their victimization at a trial.

The defendant's conduct is still egregious, however, as he participated in a scheme that victimized dozens of children over the course of nearly two years. During this time, the defendant was well aware that Wolf was a middle school teacher, and Michael encouraged Wolf not only to catfish, or "bait," his own students but provided strategies for doing so. The defendant, as a youth baseball coach himself, had a particular attraction to boys who were talented at the sport, and provided Strange with list of Little League World Series ("LLWS") players to be targeted during and shortly after the LLWS of 2021, played in Williamsport, Pennsylvania.

The defendant has been engaged in the sexual exploitation of children since approximately 2000, long before meeting Wolf and Strange on Telegram, demonstrating a lengthy pattern of criminal behavior and a longstanding deviant sexual interest in children and

images and videos depicting their sexual abuse. And, although Wolf and Strange were arrested by FBI agents in October 2021 and January 2022, respectively, the defendant continued his child exploitation efforts on his own by operating various online accounts, in which he purported to be a teenage girl to entice minor boys to self-produce CSAM and send the images to him, much like Wolf and Strange's scheme in which he participated.

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1] The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors which, along with the reasons discussed in the Sealed Supplement, support the imposition of a sentence of 340 months' imprisonment, at the top of the range contemplated by the parties' guilty plea agreement, to be followed by a period of at least 15 years of supervised release.

## I. <u>PROCEDURAL BACKGROUND</u>

On July 18, 2024, a federal grand jury returned a five-count indictment against defendant Donald Michael, a/k/a "Baseball Fun," charging him with conspiracy to manufacture child pornography, in violation of 18 U.S.C. § 2251(a) (Count One), conspiracy to receive and distribute child pornography, in violation of 18 U.S.C. § 2252(a)(2) (Count Two), receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) (Counts Three and Five), and

[1] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

distribution and attempted distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) (Count Four). On or about July 22, 2024, Michael was arrested in his home state of Arizona and was removed to EDPA to face the charges in this indictment. On April 11, 2025, the defendant entered a guilty plea to the indictment pursuant to a written, Rule 11(c)(1)(C) guilty plea agreement with the government.

These charges arise out of the defendant's participation in an online child exploitation catfishing scheme with Wolf ("Person #1" in the indictment) and Strange ("Person #2" in the indictment). Wolf's conduct came to light in October 2021 after FBI investigated a CyberTip from DropBox reporting that child pornography had been uploaded to a DropBox account associated with Wolf's SCH email address. Wolf was arrested on a federal complaint and warrant related to that conduct on October 7, 2021, after FBI executed a search warrant at his residence in Philadelphia. Law enforcement's search of Wolf's cell phone revealed that his child exploitation activities extended far beyond the DropBox uploads--- for years, he had been conspiring to catfish or bait his own middle school students, among other child victims, to self-produce CSAM and share those images with him online, and he was actively carrying out this scheme with several other perpetrators with whom he communicated via the end-to-end encrypted social media messaging platform Telegram. Strange was identified as Wolf's co-conspirator in December 2021 and was arrested on a federal complaint and warrant out of EDPA on January 5, 2022, after agents executed a search warrant at his and his parents' residences in Carthage, New York. Wolf and Strange were indicted by a federal grand jury on February 3, 2022 in EDPA Criminal Number 22-35 and charged with conspiracy to manufacture child pornography and several substantive counts of manufacturing child pornography. The indictment against Wolf and Strange included 15 identified minor victims, all but two of whom

were current or former SCH students. Both defendants entered open guilty pleas to the indictment before this Court on June 23, 2022. On February 16, 2023, this Court sentenced Wolf to 466 months' imprisonment to be followed by 5 years of supervised release. On March 31, 2023, this Court sentenced Strange to 396 months' imprisonment to be followed by lifetime supervised release. They were ordered to pay a total of $324,320 in restitution to six minor victims who sought restitution, Minors 1, 4, 5, 7, 9, and 10.[2]

The evidence of Wolf and Strange's scheme came primarily from their extensive Telegram communications that FBI extracted from Wolf's cell phone at the time of his arrest and corroboration from victim interviews. In early August 2020, Wolf began providing Strange with known social media handles for some of his students, and Strange also located some students' social media on his own. Ultimately, in January 2021, Wolf provided Strange with a detailed spreadsheet of the students he wanted Strange to target, which greatly assisted Strange in his efforts and which Wolf and Strange used to tally their successful victimization of the targeted children.[3] Wolf and Strange's child exploitation scheme was not limited to Wolf's current and former students, and they discussed other minors Strange was targeting and also shared image and video files of these minors. Among other victims, Strange sought out minor boys with large online followings, including LLWS players at Michael's suggestion, children of political figures, and child Tik Tok stars. Three LLWS series players were identified as victims after the

---

[2] Those minor victims do not seek restitution from Michael. Minor Victims 2, 13, and 15, to whom Michael has agreed to pay restitution, did not seek or receive restitution from Wolf and Strange.

[3] Wolf and Strange *did not* share the spreadsheet with Michael, and there is no evidence that Michael was aware of its existence.

indictment of Wolf and Strange, and this conduct was included as part of Wolf and Strange's guilty pleas.

Wolf and Strange involved other offenders in their scheme, including Donald Michael. In the same way the FBI extracted the communications between Wolf and Strange from within the Telegram application on Wolf's cell phone, the FBI obtained communications between Wolf and several other perpetrators. Based on the personal details and information included in the Telegram chats, to date, FBI Philadelphia has identified four of Wolf's Telegram associates, including defendant Michael, and an additional associate of Strange.[4]

## II. <u>FACTUAL BACKGROUND</u>

Long before Wolf created a spreadsheet to facilitate Strange's catfishing efforts of Wolf's SCH students, Wolf discussed his sexual attraction to his students with other Telegram associates, traded CSAM with other associates, and discussed "baiting" boys. Michael was one of these associates, with whom Wolf began communicating at least as early as April 13, 2020.

Within the Telegram application on Wolf's phone, a private chat was identified between Wolf ("Mr P") and a Telegram user with a display name of "Baseball Fun," and username "@[first initial and portion of last name of one of the defendant's former youth baseball players]" (later identified as Michael). The chat between Wolf and Baseball Fun took place between approximately April 13, 2020 and October 4, 2021. The chat contained approximately 1,483 messages over more than 300 pages of communications. Although they exchanged approximately 149 image/video files during their communications, only 31 files contained viewable content in the forensic extraction of Wolf's phone, which was conducted with the

[4] These other offenders are further discussed below in Section IV.A.5, *infra.*

phone in airplane mode. Of those viewable files, at least 19 depicted CSAM. Throughout their communications, Wolf and Michael discussed their shared sexual interest in minor boys, discussed and exchanged CSAM, and discussed and strategized "baiting" minor boys, with the assistance of "Alex" (Kray Strange), to self-produce images of child pornography and transmit them over the Internet, including Wolf's students at SCH, LLWS players, and others. In the Telegram chat, Michael and Wolf openly discussed "Alex" (Strange) and his efforts to obtain sexually explicit images and videos from minors by "catfishing" or "baiting" them. Michael's communications with Wolf made clear that Michael was also privately communicating with Strange, and Wolf and Strange also discussed "Baseball Fun" with each other, although FBI did not recover direct communications between Michael and Strange.

The defendant described his preferred age of boys to whom he was sexually attracted as 12 to 13 years old (the exact age range of boys he chose to surround himself with by coaching youth baseball), and, on one occasion, the defendant told Wolf, "I should have been a teacher… I only get to see the baseball ones… I can't say I separate it too well with baseball – it's all I think about when I'm with them!!!"

Wolf and Michael specifically discussed four identified SCH victims, (Minors 2, 3, 13, and 15), and the context of their chats regarding these children, as outlined in the government's change of plea memo and the PSR, demonstrates that Wolf shared CSAM of these four victims with Michael, although these files now appear "empty." Throughout his communications with Wolf, Michael made multiple suggestions of specific tactics Strange could use to bait Wolf's students, particularly methods of "blackmail" or sextortion. For example, when discussing Minor 2, a then-13-year-old boy whom Michael was particularly interested in victimizing because he was a "baseball boy," Michael suggested to Wolf:

> [H]e could be a good one for blackmail…. i think it would be funny to threaten them with the names of some of his teachers - saying the videos would be sent to them unless he does 'whatever'… or even have alex tell him his parents names (if you know them) - that could freak him out too… could just tell him it is being sent around to some boys in the school – that could freak him out[,] i don't know - just thinking out loud in order to get more:).

Beginning in September 2021, Wolf and Michael discussed targeting LLWS players for victimization. Michael told Wolf that he gave "Alex" (Strange) the "list of players to go after." On September 10, 2021, the defendant and Wolf traded CSAM depicting two identified LLWS players (then age 12) exposing their genitals and masturbating and engaged in the following exchange:

| | |
|---|---|
| **Defendant**: | [Sends now empty image file]<br>That's another from [identified minor victim from 2021 LLWS] |
| Wolf: | 😊 what a perfect dick and pubic area |
| **Defendant**: | yup – and you can tell he has never cum – doesn't know how to jerk – perfect |
| Wolf: | I saw their stats online. 5'2" 90-92 pounds |
| **Defendant**: | perfect, right… |
| Wolf: | Ty!<br>After drooling at my TV all these years watching LLWS, to have now seen a couple of boys like this… mmmm |
| **Defendant:** | lol – for sure – I'm hoping this becomes a yearly activity!!<br>… |
| **Defendant**: | … funny thing is, I'm talking with the pitcher, [minor victim's name] as well – he is not talkative at all – barely get a reply every other day |
| Wolf: | still fun to know you are talking to him though. Didn't know you were talking to any boys! You talking with any of the others? |
| **Defendant**: | just started – I've sent some messages to other little league boys but don't really get any responses – just having fun |

Wolf: Did you make a fake acct I assume

**Defendant:** yeah had one for awhile

Michael also provided Wolf and Strange with the full name of another child to be targeted for victimization, whom Michael claimed was his former baseball player.[5]

Despite bragging to Wolf about using a VPN and being very careful about not getting caught, Michael made a significant mistake in his communications with Wolf when he shared a screenshot of his own baiter Instagram account, a minor girl persona named "Steph Turner." Further investigation of this Instagram account led to Michael, whose identity was corroborated by other true personal details he shared with Wolf during their months of communication, including his history coaching youth baseball in Virginia and his work transfer from Virginia to Arizona, among other facts.

The defendant's child exploitation activity has not been limited to his communications with Wolf and Strange. During this investigation, FBI uncovered at least four CyberTips from various electronic service providers to the National Center for Missing and Exploited Children (NCMEC) regarding accounts associated with the defendant uploading or exchanging child sexual abuse material. One of these involved a Twitter account the defendant used as recently as 2023, in which the defendant purported to be a 12-year-old boy, solicited CSAM from other users, and exchanged CSAM with other Twitter users via direct messages, including a 15-year-old boy who resided in EDPA. Notably, the defendant's Twitter account handle used the last

---

[5] FBI Philadelphia identified this child and interviewed his father on March 6, 2024. The father reported that he did not recall his son being coached by Michael, but his son may have played against a team coached by Michael sometime in 2018. The child's name did not appear on the roster of any teams coached by Michael obtained through grand jury subpoena in this investigation.

name of one of his former youth baseball players, followed by a series of numbers, for the account handle.

On February 21, 2024, FBI executed a federal search warrant at the defendant's residence in Gilbert, Arizona, and seized the defendant's iPhone from his person. The iPhone was forensically examined. The iPhone was set up on January 3, 2024, just a month before the search warrant. In an overall self-serving statement, the defendant told FBI that he destroyed his old cell phone by *smashing it with a hammer* for no particular reason. The device phone number was the defendant's longtime phone number, associated with the CyberTips described above. Despite having had this phone number for approximately 20 years, the defendant changed his number after the search warrant was executed. Most importantly, the forensic examination of the defendant's cell phone revealed a cookie for the "Steph Turner" Instagram account and showed that the Instagram username and unique user ID were saved in the Keychain feature of the iPhone. The phone also contained login information for an IPVanish VPN account with a username of the last and first name of another former youth baseball player Michael coached. The Telegram application was not currently installed on the device, but the phone contained log entries of cellular network data usage from the Telegram application. The phone contained hundreds of videos and images of the LLWS, primarily of the 2023 Needville, Texas team. These included cached images of the players' bios, listing their names, photos, numbers, and fun facts.

The defendant's iPhone also contained Instagram login data for at least 18 other unique Instagram user IDs, most of which had girls' names as the usernames, and which Michael used to sexually exploit dozens of minor boys online by purporting to be a minor girl, anywhere between

the age of 12-14 years old, depending on the age of the boy with whom he was communicating. FBI Philadelphia identified at least five of these additional victims.

The defendant's phone contained one thumbnail image from the photos application that appears to depict child pornography with a creation date of February 5, 2022, and at least 200 images of child erotica, to include images of minor boys wearing bathing suits and posing for shirtless photos. The phone also contained "age-difficult" pornographic material, some of which was later identified as CSAM depicting a 14-year-old boy whom Michael previously coached in youth baseball in the late 1990s and early 2000s. *See* Exhibit A, attached, to be filed under seal. On October 16, 2024, FBI agents interviewed this former youth baseball player, then age 37, at his home in Virginia. In his interview with FBI, he disclosed for the first time that Michael used a digital camera to photograph him exposing his penis when he was approximately 14 years old, right after he stopped playing baseball. Michael told the child that he knew a girl who would pay for the photos, and Michael said he would send them to her. Michael would have been approximately 23 years old at this time.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

**Conspiracy to manufacture child pornography, 18 U.S.C. § 2251(a)(1) (Count One):** 30 years' imprisonment with a 15-year mandatory minimum term of imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution pursuant to 18 U.S.C. § 2259 of at least $3,000 per victim, and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, and up to $50,000 in additional assessments may be imposed under 18 U.S.C. § 2259A.

**Conspiracy to receive and distribute child pornography, receipt of child pornography, and distribution and attempted distribution of child pornography, 18 U.S.C. § 2252(a)(2) (Counts Two through Five):** For each count, 20 years' imprisonment, with a 5-year mandatory minimum term, a minimum 5 years up to a lifetime of supervised release, a $250,000 fine,

mandatory restitution pursuant to 18 U.S.C. § 2259, a $100 special assessment, and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, and up to $35,000 in additional assessments may be imposed under 18 U.S.C. § 2259A.

**TOTAL MAXIMUM PENALTY**: 110 years' imprisonment with a mandatory minimum term of 15 years' imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $1,250,000 fine, a $500 special assessment, mandatory restitution pursuant to 18 U.S.C. § 2259, and if found to be non-indigent, an additional mandatory $25,000 in special assessments must be imposed pursuant to 18 U.S.C. § 3014 (the Justice for Victims of Trafficking Act, or JVTA), and up to $190,000 in additional assessments may be imposed under 18 U.S.C. § 2259A (the Amy, Vicky, and Andy Act, or AVAA). Full restitution shall be ordered.

### B. Sentencing Guidelines Calculation

The government agrees with the Probation Office's calculation of the defendant's advisory Sentencing Guideline range, outlined in PSR Paragraphs 47-62. The parties also stipulated to these guidelines in paragraph 13 of the written guilty plea agreement.

With a Criminal History Category I and final offense level of 40, the advisory Guideline range is 292 to 365 months' imprisonment. PSR ¶ 112.

## IV. SENTENCING ANALYSIS

A thorough consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a prison sentence of 340 months, at the top of the range contemplated by the parties' plea agreement, is warranted.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the

law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**A. Consideration of the 3553(a) Factors**

1. The nature and circumstances of the offense

The production of child pornography is undisputedly a grave offense. As the Supreme Court has explained, "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Government have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008). Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Sentencing Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003).* Indeed, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep. No. 108-66; S. Rep. No. 104-358*, especially in light of the continuing harm caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers," which results in a robust and growing market for child pornography and, therefore, increased abuse of innocent children. *See Child Pornography Prevention Act of 1996,* Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27

(1996), codified at 18 U.S.C. § 2251 note; *United States v. MacEwan*, 445 F.3d 249, 250 (3d Cir. 2006); *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). The Supreme Court has clearly recognized the harm to these children, noting that the "materials produced are a permanent record of the children's participation…" in the abuse. *See New York v. Ferber*, 458 U.S. 747, 759 (1982); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.").

Here, the defendant committed these crimes after having coached youth baseball for approximately 20 years. In addition to engaging in the online world of child pornography, which repeatedly victimizes some of the most vulnerable members of society with each time these children's images of being sexually abused by adults are viewed and shared, the defendant went even further and targeted his co-conspirator's own middle school students for sexual exploitation. With his youth baseball coaching, the defendant chose to surround himself with boys in the exact age range to which he is most sexually attracted. He regularly intermingled his deviant sexual interest in pubescent boys with his coaching. For years, the defendant managed to conceal his true deviant sexual interests from his players and their parents. His players viewed him as a role model. His players' parents trusted him to protect their kids and further their athletic and personal development. Instead, he was sexually attracted to the boys, exploited at least one of them, and fixated on some of them. As a youth coach for 20 years, the defendant should have carried an even greater responsibility than other citizens to protect the safety and well-being of innocent children. Instead, he helped a middle school teacher exploit his students

and others for his own sexual gratification.[6] And he continued this conduct for years after his co-conspirators were arrested. The defendant also identified specific children for the group to target, including the LLWS players and at least one child whom Michael claimed was his former youth baseball player.

During 2020 and 2021, the defendant's school-age victims were made even more vulnerable by the Covid-19 pandemic. They were in virtual school, isolated from in-person association with most of their friends and those in their peer group. Like most of society, they were using the Internet to communicate with their friends and loved ones outside of their nuclear families. Use of the Internet to meet friends was normalized, and many of the defendant's victims believed they were communicating with a similarly aged girl who was the friend of a friend. The defendant preyed upon this vulnerability, as well as the fact that his intended victims were young teenage boys going through puberty who would respond to positive attention from an attractive girl their same age. When boys resisted sending additional CSAM, Michael suggested escalating to blackmail and sextortion of the children, such as threatening to share the images with the boys' friends, classmates, and parents.

While the defendant's involvement in this child exploitation scheme is the most egregious aspect of his conduct, those crimes and the others charged in the Indictment only scratch the surface of the defendant's involvement in the child exploitation world. On his own,

[6] The government expects some of the victims' parents to attend the sentencing hearing, at which time they may choose to address the Court and provide victim impact testimony. The government has also received a written victim impact statement from the parents of Minor 2, attached here as **Exhibit B, to be filed under seal.** Should the government receive additional written statements in advance of the sentencing hearing, they will be forwarded to the Court and counsel to be included as part of Exhibit B.

the defendant exploited numerous other boys on the Internet by purporting to be a minor girl. He traded, received, and distributed CSAM. He fixated on his former youth baseball players—using their names for his online account usernames and passwords, searching for them on the Internet, and maintaining photos of them. For one of these former players, Michael maintained CSAM depicting the child that Michael produced for more than 20 years.

2. <u>The history and characteristics of the defendant</u>

The defendant has been sexually exploiting children since at least as early as approximately 2000. Over the years, the defendant became entrenched in this dark world by developing relationships with other offenders on the platform Telegram and escalating to victimizing children on a near daily basis in the years leading up to FBI Philadelphia identifying him as "Baseball Fun," and the operator of several other online accounts where he purported to be a minor girl for the purpose of sexually exploiting minor boys.

The defendant engaged in this criminal conduct despite many aspects of his life that should have deterred him from such behavior. He engaged in this conduct despite his stable upbringing and continued close relationship with his family. He engaged in this conduct despite being well educated and financially secure. The defendant's failure to abide by the law even with these supportive factors in place further justifies a sentence of 340 months' imprisonment.

Both Dr. Justin Rigsbee, forensic psychologist for the Bureau of Prisons, and the defendant's psychological expert, Dr. Frank Dattilio, agree that the defendant has an above-average or moderate to high risk for reoffending, particularly without treatment. Fortunately, the community will be protected from the defendant while he is incarcerated, and he can and should receive intensive sex offender treatment while in custody.

Though this is the defendant's first criminal conviction, he has already demonstrated a

pattern of child exploitation by sexually exploiting multiple victims and engaging in years of communication with other sexual predators on the Internet. The defendant clearly was deeply entrenched in the world of child pornography and exploitation. The Guidelines already reflect the fact that the defendant has no prior criminal record. He should not now receive any additional consideration for this reason. See *United States v. Borho,* 485 F.3d 904 (6th Cir. 2007) (There were no 'extraordinary circumstances' that justified a decreased sentence based on, among other considerations, the defendant's lack of a criminal history, lack of evidence that he had ever molested a child, and a sex offender risk assessment that opined that the defendant was at low risk for re-offending); *United States v. Peterson*, 83 Fed.App'x. 150 (8th Cir. 2003) (appeals court reversed District Court's downward departure based on the low likelihood for re-offense and susceptibility to abuse in prison, as the first factor was already accounted for in the Guidelines and the second factor was inapplicable to the facts of the case); *United States v. Goldberg*, 295 F.3d 1133 (10th Cir. 2002) (defendant's lack of prior record, and low risk of recidivism are not valid grounds for downward departure because those factors are all taken into account in the Guidelines themselves). The defendant's lack of a prior record should not provide any basis to vary from the Guideline range, based on the facts of this case.

The vast majority of federal child pornography offenders have no prior records at the time that they are sentenced. *U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320 (2011)* available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm. This puts the defendant squarely in the heartland of most sex offenders in federal court. Indeed, in the Eastern District of Pennsylvania, a review of the sentences which were imposed for defendants who

committed the same type of offenses shows that most defendants were first time offenders who pled guilty.

3. The seriousness of the offense, respect for the law, and just punishment

A sentence of 340 months' imprisonment is a significant prison sentence, particularly for an offender like Michael, who has never before spent any time in prison. It "reflect[s] the seriousness of the offense, promote[s] respect for the law, and provide[s] just punishment for the offense." § 3553(a)(2).

4. Deterrence

Deterrence is also one of the factors that calls for a significant sentence of incarceration. The defendant himself needs to be deterred from sexually exploiting children in the future. A lengthy term of 340 months' imprisonment can accomplish this goal. Section 3553(a)(2) also mandates that the Court consider a sentence that adequately deters others who would commit similar offenses. The sentence in this case must give notice that the sexual exploitation of children has serious and significant consequences, particularly for those who choose to work with children, only to abuse their positions to victimize children. A sentence of this length will serve as a deterrent to others inclined to sexually exploit children.

5. Consistency in Sentencing

A sentence within the range of 265 to 340 months' imprisonment, as contemplated by the parties' guilty plea agreement, fairly accounts for Michael's culpability relative to his co-conspirators. As discussed above, the government views Michael as slightly less culpable in the child exploitation scheme than Wolf and Strange, and his sentence should reflect that lesser culpability. Wolf and Strange received significant and well-deserved sentences of 466 months' imprisonment and 396 months' imprisonment, respectively. Both faced sentencing guidelines of

life imprisonment because they were convicted of several substantive counts of manufacturing child pornography, in addition to the conspiracy offense, so their sentences— while still significant— represented downward variances from their sentencing guideline ranges. Michael's sentence should reflect the fact that Wolf and Strange excluded him from one of the most egregious aspects of the scheme by not sharing their score-keeping spreadsheet with him. Michael's sentence should also distinguish him from another related defendant sentenced by this Court in 2024, Patrick Knauss, 24-cr-52. Knauss, like Michael, was involved in a conspiracy with Wolf and Strange to manufacture, distribute, and receive child pornography and he received a sentence of 265 months' imprisonment. Unlike Michael, Knauss did not maintain a position of community trust and did not have direct communication with any identified child victims. Michael is more culpable than Knauss and has earned a higher sentence than 265 months' imprisonment, the bottom of the range contemplated by the parties' plea agreement.

In addition to Michael and Knauss, to date FBI Philadelphia has identified three other offenders who communicated on Telegram with Wolf and Strange regarding their shared sexual interest in children, traded child pornography with them, and, on occasion, discussed and participated in their scheme to catfish minor boys to manufacture child pornography. These individuals were charged in other federal districts:

- Alden Bunag (aka "Alden"), a former teacher, was charged in the District of Hawaii, Criminal Number 23-41. Bunag was engaged in hands-on abuse of one of his own minor students and shared videos of himself engaged in sex acts with the child with Wolf. He pleaded guilty to one count of manufacture of child pornography and was sentenced to 210 months' imprisonment to be followed by 15 years of supervised

release in January 2024. There is no evidence that Bunag was involved in the conspiracy to manufacture child pornography by catfishing boys online.

- Daniel Dasko (aka "Mr. Pickles"), a former teacher and youth hockey coach, was charged in the Southern District of California, Criminal Number 22-1715. Dasko pleaded guilty to distribution of child pornography with the cross-reference to manufacturing sentencing guidelines and was sentenced to 188 months' imprisonment to be followed by 15 years of supervised release in September 2023. Among other activities, Dasko provided information about his students and hockey players to Strange for the purpose of baiting them.
- James Bowers (aka "Garfield"), an associate of Strange, was charged in the Southern District of New York, Criminal Number 24-439, with distribution and receipt of child pornography, and pleaded guilty to these offenses. He is awaiting sentencing, scheduled for December 2026.

The sentencing range contemplated by the parties' guilty plea agreement also is consistent with sentences imposed in EDPA on offenders who engage in online production of child pornography. Such sentences are frequently within or slightly below the sentencing guideline range, but well above the 15-year mandatory minimum. *See, e.g., United States v. Jeremy Schobel* (23-475) (Murphy, J.) (sentence of 360 months' imposed on a high school teacher defendant who posed as a minor girl online to entice minors to produce CSAM and send him the images, including at least one of his own students); *United States v. Seibert* (17-572) (Leeson, J.) (sentence of 360 months' imposed where defendant used a fake teenage persona to entice two victims to produce sexually explicit images online; guidelines of 360-life); *United States v. Connor* (19-057) (Sanchez, J.) (sentence of 300 months' imposed where 22-year-old

defendant enticed one teen victim online; guidelines called for life imprisonment); *United States v. Cunningham* (18-391) (Diamond, J.) (sentence of 240 months' imposed where defendant, a public school teacher's aide, used a fake teenage persona to entice three victim students to produce sexually explicit images online; guidelines of 235-293 months' imprisonment); *United States v. Tyler Moury*, (21-433) (McHugh, J.) (sentence of 35 years' imposed where 24-year-old defendant enticed two teen girls to produce sexually explicit images online and produced images of one victim during a sexual encounter with her; guidelines of life imprisonment); *see also United States v. Totoro*, (15-291) (Pappert, J.) (sentence of 300 months' imprisonment imposed for former tennis coach who produced images of one athletic student during sexual abuse of her; guidelines of 292-365 months).

For all these reasons, the government submits that a sentence of 340 months' imprisonment is a fair and appropriate sentence.

6. Guideline Policy Statements Issued by the Sentencing Commission

The sentence sought by the government also comports with the policy statements and studies conducted by the United States Sentencing Commission ("USSG"). In October 2021, the USSG published a report entitled Federal Sentencing of Child Pornography Production Offenses (hereinafter "Child Pornography Production Report"). *See* www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf. This report is a compilation of data from 2005 through 2019 for every offender convicted in the United States of the crime of production of child pornography. Importantly, the Sentencing Commission found that in the 15-year period studied, the long-term trend shows that "[C]ourts consistently sentence child pornography production offenders to lengthy sentences." *See Child Pornography Production Report* at 21.

Indeed, in analyzing the bases for the Courts' imposition of such lengthy sentences, the Sentencing Commission recognized that "child pornography production offenses are serious crimes that memorialize the sexual abuse and exploitation of children." *Id.* at 54.

The Child Pornography Production Report analyzed a number of cases over the 15-year study period, and determined "average" sentences imposed for production offenses.[7] The data showed that the "average" sentence increased in length for the most egregious of production offenders. The Commission found that courts imposed longer than average sentences when various factors were present in a case, many of which are also present in defendant Michael's case, including: the defendant maintaining a position of trust or authority in the community as a

[7] The Report found that the average sentence imposed for all production crimes was 275 months' incarceration. *Id.* at 21-22. Importantly, the "average" sentencing numbers are based on data that inaccurately results in "average" sentences that are actually *lower* than the true average sentence. In calculating these averages, those defendants who received sentences of 470 months or greater (including life) were limited in the sentence average computations as just 470 months' incarceration. *See* Child Pornography Production Report at 21, FN 35. That means that those who received sentences greater that 470 months' incarceration were capped at just 470 months (39 years), ***thus creating an inaccurate "average" sentence that is lower than the true average sentence imposed for these most egregious crimes.***

Though the Report shows that 57% of the sentences represented downward variances from the applicable sentencing Guideline range, more than 20% of that number was based on government-sponsored downward variances. *Id.* at 22. In other words, only a little over one-third of the cases involved downward variances granted by the Court without the prosecutor's motion. A recent study ordered by another Court in this district revealed similar results for the EDPA: downward variances were imposed in only 36% of the cases on the Court's own motion. The majority of the EDPA sentences for § 2251 offenses remain within the calculated Guideline ranges. **Significantly, in 16% of the EDPA cases, a sentence of life or life-equivalent incarceration was imposed, even when the offender had pleaded guilty and had no prior criminal history.**

As noted above, for many of these offenders, the calculated Guideline range is life imprisonment, so that even a sentence that represents a "downward variance" still results in decades in prison.

youth sports coach, *id*. at 45; the defendant's use of coercive tactics and enticements, *id.* at 48; the defendant's misrepresentation of his identity to commit the offense, *id.*; the defendant's engagement in non-production child pornography conduct, *id.* at 49, and the defendant's pattern of sexual exploitation of children, *id.* at 50.

In short, the defendant's conduct is far more egregious than the "average" online child exploitation offender, and he has earned a 340-month sentence.

7. Other considerations

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner… ." § 3553(a)(2)(D). The defendant can and should receive sex offender treatment while serving his federal prison sentence.

8. Restitution and Financial Penalties

A. Restitution

Restitution is mandatory pursuant to 18 U.S.C. § 2259. The government has received restitution requests from three identified victims in this case: Minor 2, Minor 13, and Minor 15, and the defendant has agreed to the payment of restitution to these victims as follows:

| Victim | Restitution Amount |
|---|---|
| Minor 2 | $50,000 |
| Minor 13 | $54,713 |
| Minor 15 | $33,120 |

Under § 2259, restitution covers "the full amount of the victim's losses." § 2259(b)(1), (3). A court may not decline to order restitution because of the defendant's economic circumstances or "the fact that the victim has, or is entitled to, receive compensation" from another source. § 2259(b)(4)(B).

Section 2259 provides as follows:

> (a) In general.—Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter.
>
> (b) Scope and nature of order.—
>
> > (1) Directions.—Except as provided in paragraph (2), the order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses.
> >
> > (2) Restitution for trafficking in child pornography – If the defendant was convicted of trafficking in child pornography, the court shall order restitution under this section in an amount to be determined by the court as follows:
> >
> > > (A) Determining the full amount of a victim's losses – The court shall determine the full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim;
> > >
> > > (B) Determining the restitution amount – After completing the determination required under subparagraph (A), the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000.
> >
> > (3) Enforcement. – An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.
> >
> > (4) Order mandatory – (A) The issuance of a restitution order under this section is mandatory. (B) The court may not decline to issue an order under this section because of – (i) the economic circumstances of the defendant, or (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.
> >
> > (c) Definitions. --
> >
> > ***
> >
> > (2) Full amount of the victim's losses - For purposes of this subsection, the term "full amount of the victim's losses" includes any costs incurred or that

> are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim, and in the case of trafficking in child pornography offenses, as a proximate result of all trafficking in child pornography offenses involving the same victim, including -
>
> (A) medical services relating to physical, psychiatric, or psychological care;
>
> (B) physical and occupational therapy or rehabilitation;
>
> (C) necessary transportation, temporary housing, and child care expenses;
>
> (D) lost income;
>
> (E) reasonable attorneys' fees, as well as other costs incurred; and
>
> (F) any other relevant losses incurred by the victim.

18 U.S.C. § 2259.

The government bears the burden of demonstrating, by a preponderance of the evidence, "the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e); *United States v. Graham*, 72 F.3d 352, 356 (3d Cir. 1995). A restitution order is reviewed for abuse of discretion. *Graham*, 72 F.3d at 355. As the Third Circuit has noted, "the Federal Rules of Evidence do not apply in sentencing proceedings," *United States v. Campbell*, 295 F.3d 398, 406 (3d Cir. 2002), but "information relied upon at sentencing must have 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Berry*, 553 F.3d 273, 280 (3d Cir. 2009). In addition, "the Confrontation Clause does not apply in the sentencing context and does not prevent the introduction of hearsay testimony at a sentencing hearing." *United States v. Robinson*, 482 F.3d 244, 246 (3d Cir. 2007); *see also United States v. Brown*, 534 F. App'x 132, 137–38 (3d Cir. 2013).

i. <u>Factors to be Considered in Determining Restitution</u>

In *Paroline v. United States*, the Supreme Court laid out the considerations necessary to determine restitution awards in child pornography cases. 572 U.S. 434 (2014). The Court stated: "At a general level of abstraction, a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id*. at 459. The assessment does not require a "precise mathematical inquiry," and involves the use of "discretion and sound judgment." *Id.* The Court listed "a variety of factors district courts might consider in determining a proper amount of restitution," noting that "it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount at this point in the law's development." *Id*. at 459-60. The list of factors is neither mandatory nor exhaustive, but "could include" the following:

> The number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role. *Id*.

In determining the type of losses that are considered to have been "proximately caused" by the defendant's sexual exploitation crimes, courts have recognized the victims' costs of treatment and lost income resulting from the trauma of knowing that the images of their abuse are being viewed over and over again, the creation of a market for these images, the invasion of the victims' privacy, and the damage to their psychological well-being. *Paroline*, 572 U.S. at 449. *United States v. Olivieri*, 2012 WL 1118763, at *4 (D.N.J. 2012); *Crandon*, 173 F.3d at

126; 18 U.S.C. § 2259(b)(3)(A) through (F).

ii. Victims' Losses

The government attaches supporting documentation for the victims' losses in Exhibit C, attached, to be filed under seal.

B. Other Financial Penalties

The defendant is subject to the Justice for Victims of Trafficking Act (JVTA), and the government asks the Court to impose the mandatory, additional special assessment of $5,000 per count pursuant to 18 U.S.C. § 3014 because the defendant is not indigent, for a total JVTA assessment of $25,000. PSR ¶ 122. The defendant is also subject to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA), up to a total possible AVAA assessment of up to $190,000. 18 U.S.C. § 2259A; PSR ¶ 123. The government requests that the Court assess the defendant a total of at least $50,000 under the AVAA.

## V. <u>CONCLUSION</u>

For the reasons set forth above, the appropriate considerations of sentencing favor the imposition of a sentence of 340 months' imprisonment to be followed by a period of at least 15 years of supervised release.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused a true and correct copy of the foregoing Government's Sentencing Memorandum to be served by email upon counsel for defendant:

Brian Russo, Esq.
bfrusso@att.net

Emmett Madden, Esq.
emadden@thephillylawyers.com

*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

Date: September 14, 2026